# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JESSE L. MOORE,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:20cv00002 |
| v. | ) | |
| | ) | **REPORT AND** |
| **ANDREW M. SAUL,** | ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** | ) | |
| Defendant | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### *I. Background and Standard of Review*

Plaintiff, Jesse L. Moore, ("Moore"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition. Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there

-1-

is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Moore protectively filed his application for DIB on December 13, 2016, alleging disability as of November 15, 2016,[1] based on breathing problems, including black lung disease,[2] chronic obstructive pulmonary disease, ("COPD"), and emphysema, requiring use of oxygen when sleeping; alpha-1 antitrypsin deficiency;[3] osteoporosis; gastroesophageal reflux disease, ("GERD"); residuals from a fractured T9 vertebra; insomnia; and anxiety and panic attacks.[4] (R. at 15, 215-16, 244, 289.) The claim was denied initially and upon reconsideration. (R. at 139-41, 145-47 150-54, 156-58.) Moore then requested a hearing before an administrative law judge, ("ALJ"). (R. at 159-60.) The ALJ held a hearing on October 26, 2018, at which Moore was represented by counsel. (R. at 36-60.)

By decision dated January 9, 2019, the ALJ denied Moore's claim. (R. at 15-28.) The ALJ found that Moore met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2018. (R. at 17.) The ALJ found that Moore had not engaged in substantial gainful activity from November 15, 2016,

---

[1] At his hearing, Moore amended his onset date from June 29, 2013, to November 15, 2016. (Record, ("R."), at 39.)

[2] Black lung disease is also known as coal workers' pneumoconiosis. *See* lung.org/lung-health-diseases/lung-disease-lookup/black-lung (last visited Apr. 7, 2021).

[3] Alpha-1 antitrypsin deficiency is a genetic disease resulting from the liver not making enough of the protein called alpha-1antitrypsin or AAT. It can cause serious liver or lung disease. AAT is needed to protect the lungs, and without it, infections and other irritants, like tobacco smoke, break down parts of the lungs. *See* webmd.com/lung/copd/alpha-1-antitrypsin-deficiency-rare (last visited Apr. 7, 2021).

[4] Moore filed a prior DIB claim on January 31, 2014, alleging disability as of June 29, 2013. (R. at 69.) By decision dated November 14, 2016, the ALJ denied this claim, finding Moore was not disabled from June 29, 2013, through November 14, 2016. (R. at 69-87.)

through December 31, 2018.[5] (R. at 17.) The ALJ determined that, through the date last insured, Moore had severe impairments, namely COPD; pneumoconiosis; emphysema; alpha-1 deficiency; history of thoracic spine fracture; and anxiety, but he found that Moore did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-18.) The ALJ found that Moore had the residual functional capacity to perform simple, routine light[6] work requiring no more than occasional climbing, stooping, kneeling, crouching and crawling; no more than occasional exposure to temperature extremes, wetness, humidity, vibrating surfaces, pulmonary irritants, hazardous work environments and unprotected heights; and that did not require strict production rate or pace requirements. (R. at 20.) Through the date last insured, the ALJ found that Moore was unable to perform any of his past relevant work. (R. at 26.) Based on Moore's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Moore could perform, including the jobs of a furniture rental consultant, a children's attendant and an addressing clerk. (R. at 26-27.) Thus, the ALJ concluded that Moore was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 28.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Moore pursued his administrative appeals, (R. at 211-12), but the Appeals Council denied his request for review. (R. at 1-5.)

---

[5] Therefore, Moore must show that he was disabled between November 15, 2016, the alleged onset date, and December 31, 2018, the date last insured, in order to be eligible for benefits.

[6] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

Moore then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Moore's motion for summary judgment filed October 21, 2020, and the Commissioner's motion for summary judgment filed November 9, 2020.

## II. Facts[7]

Moore was born in 1970, (R. at 215), which, at the time of the alleged disability onset date and the date last insured, classified him as a "younger person" under 20 C.F.R. § 404.1563(c). Moore has a high school education and training in welding. (R. at 43, 245.) He has past work experience as a skidder and dozer operator for a logging company, a roof bolter in a coal mine and a shuttle car operator in a coal mine. (R. at 43-44.) Moore testified he previously broke his back, which did not heal correctly, causing a vertebra to push against a cord and resulting in pain all the time. (R. at 52.) He testified he took Percocet for pain, which offered "short relief," requiring him to take a lot of "Goody powders in between." (R. at 45, 52.) When asked what kind of treatment he was getting for his back, he said he just watched what he did, and there was not much that could be done. (R. at 51-52.) Moore stated as long as he "watch[ed] what [he was] doing when [he was] bent over, watch[ed] which way [he] get[s] back up[,]" his back was ok. (R. at 51.) He also testified he did not pick anything up that weighed anything. (R. at 52.) Moore said he had back pain "pretty much all the time," and it was on his mind and affected his ability to focus and concentrate. (R. at 52.) He estimated he could sit for 30 to 40 minutes before having pain and discomfort and stated, "I do a lot of rearranging." (R. at 53.)

---

[7] The court will focus on the facts and evidence relevant to Moore's musculoskeletal impairments during the time period at issue in this case, as Moore's sole argument on appeal relates to his chronic back pain.

Moore stated that sitting for hours at a time was "miserable," and he could not perform a job that required him to sit all day. (R. at 53-54.) However, Moore testified he had to sit and rest several times per hour throughout the day. (R. at 54.) He stated he could stand for 30 to 40 minutes before having to squat down on his feet, as this gave him better relief than sitting. (R. at 53.) He estimated he could walk 200 feet. (R. at 47, 53.)

Moore stated he quit working when he broke his back, and then he began having "lung trouble." (R. at 46.) He testified the pulmonologist took him out of work due to his lung issues. (R. at 46.) Moore stated he had difficulty walking uphill, which required him to stop to catch his breath for a second. (R. at 46-47.) He testified his breathing was labored with exertion. (R. at 47.) He testified he felt smothered at times, and he used a rescue inhaler when he overexerted himself. (R. at 50-51.) Moore testified he contracted pneumonia and upper respiratory infections easily, and he tried to avoid strong fumes like hairspray and perfumes. (R. at 55.) Moore testified he took Vistaril for anxiety, but he took no other medication, and he was not in mental health counseling. (R. at 46.) He stated he had panic attacks at night that also caused shortness of breath, for which he used a rescue inhaler. (R. at 48, 51.) Moore stated he could not identify any triggers for these panic attacks, which occurred three to five times weekly and lasted from 15 minutes to two hours. (R. at 48-49.) He testified crowds made him very nervous, and he could not perform a job even where he did not have to exert himself because he could not deal with people. (R. at 53-54.)

Rick Bradley, a vocational expert, also was present and testified at Moore's hearing. (R. at 56-58.) Bradley classified Moore's past work as a roof bolter, a shuttle

car operator and a skidder operator as medium[8] and semi-skilled work. (R. at 56.) He testified that a hypothetical individual of Moore's age, education and work history, who had the residual functional capacity to perform simple, routine light work with no more than occasional climbing, stooping, kneeling, crouching and crawling; no more than occasional exposure to temperature extremes, wetness or humidity, vibrations, pulmonary irritants such as fumes, odors, dust, gases, poor ventilation or chemicals and hazards such as hazardous machinery or unprotected heights; and with no strict production rate or pace requirements, could not perform any of Moore's past work. (R. at 56-57.) However, Bradley testified this individual could perform jobs existing in significant numbers in the national economy, including those of a furniture rental consultant and a children's attendant, both at the light level of exertion, as well as an addressing clerk, at the sedentary[9] level of exertion. (R. at 57.) Bradley next was asked to consider the same hypothetical individual, but who also could have no more than occasional interaction with the general public, co-workers and supervisors. (R. at 57.) He testified such an individual could perform the addressing clerk job, as well as the light jobs of a retail marker and a bagger. (R. at 57-58.) Bradley testified an individual who would be off task more than 10 percent of a workday due to unscheduled breaks could not perform any jobs. (R. at 58.)

In rendering his decision, the ALJ reviewed medical records from William

---

[8] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2020).

[9] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

Carne, Ph.D., a state agency psychologist; Dr. Nicolas Tulou, M.D., a state agency physician; Stephen P. Saxby, Ph.D., a state agency psychologist; Dr. Roger Tims, M.D., a state agency physician; Lonesome Pine Hospital; Mountain View Hospital; Lee Regional Hospital; Jonesville Family Health Center; Wellmont Medical Associates; Bristol Neurosurgical Associates; Holston Valley Medical Center; Stone Mountain Health Services; St. Charles Community Health Clinic; and Wellmont Health System.

The record shows that Moore began receiving pain management services from Dr. Frederick Terry, D.O., at Bristol Neurosurgical Associates, on October 15, 2015, for upper back pain at the request of his primary care provider. (R. at 466.) Dr. Terry noted Moore had been diagnosed with a T9 compression fracture a few years previously without any known injury. (R. at 466.) He suffered severe pain and eventually left his job on long-term disability. (R. at 466.) Moore reported taking oxycodone previously, but he wished to avoid opioids if possible. (R. at 466.) A physical examination showed Moore was in no apparent distress, he had a normal gait, full strength in all major muscle groups, normal muscle tone overall, intact cranial nerves, normal sensation and normal deep tendon reflexes, but pain and decreased range of motion with back flexion and extension. (R. at 466.) Dr. Terry diagnosed pathologic vertebral compression fracture and opioid dependence, in remission, and he prescribed Celebrex and Tramadol. (R. at 467.) Moore continued receiving pain management from Dr. Terry, and on September 28, 2016, less than two months prior to his alleged onset date, it was noted that Moore's pain was most prominent in the mid thoracic spine without radiation, and it was described by Moore as constant, moderate in intensity, throbbing, aching and stabbing. (R. at 667.) He reported worsening with back flexion, extension and twisting movements, and he described associated symptoms of stiffness and paravertebral muscle spasm. (R. at

667.) Moore noted some relief with rest and narcotic pain medication. (R. at 667.)
Moore stated his current regimen, which consisted of meloxicam and Norco,
provided him tolerable pain and allowed him to maintain his activities of daily living,
household chores and to spend time with family and friends without intolerable pain.
(R. at 667-68.) His examination remained unchanged, as did Dr. Terry's diagnoses.
(R. at 668.) He continued Moore's medications. (R. at 668.) On November 23, 2016,
Moore reported having increased pain over the prior few months, but did not want
to say anything for fear of being labeled a drug seeker. (R. at 670.) Dr. Terry noted
that, historically, Moore had been on higher doses of opioids. (R. at 670.)
Nonetheless, he was in no apparent distress, and his physical examination remained
the same. (R. at 671.) Dr. Terry prescribed meloxicam, discontinued Norco and
prescribed Percocet. (R. at 671.) By December 19, 2016, Moore stated the switch to
Percocet had been helpful, noting times that the medication still "falls short, but it
was tolerable." (R. at 673.) He denied any new complaints or concerns, and his
examination remained the same, including being alert and fully oriented. (R. at 674.)
Dr. Terry continued Moore on meloxicam and Percocet. (R. at 674-75.)

Moore saw Dr. Jill Couch, D.O., his primary care provider at Jonesville
Family Health Center, on December 16, 2016, stating he felt "ok." (R. at 653.) He
reported "getting out and doing things" and having fair energy. (R. at 653.) Moore
endorsed back pain and anxiety. (R. at 654.) On examination, he was in no acute
distress, he had a normal gait and a stable lumbar spine with normal lumbar lordosis,
but there was palpable indentation, and lumbar range of motion was decreased. (R.
at 654-55.) Moore was fully oriented with a euthymic mood and appropriate affect.
(R. at 655.) Diagnoses included fatigue, vitamin D deficiency, COPD and GERD.
(R. at 655.) Dr. Couch instructed Moore to continue taking calcium and vitamin D
for the old compression fracture and to continue with pain management. (R. at 655.)

When Moore returned to Dr. Couch on March 17, 2017, he, again, reported feeling "ok." (R. at 704.) His physical and mental status examinations were unchanged, as were Dr. Couch's diagnoses and recommendations. (R. at 706.)

An April 5, 2017, treatment note from Wellmont Medical Associates for Moore's respiratory impairments indicates he "can do farm work without much restriction." (R. at 691.) He denied arthralgias and back pain, as well as decreased concentration, among other things. (R. at 693.) On examination, Moore was in no distress, and he had normal range of musculoskeletal motion with no edema or tenderness. (R. at 694.) He was fully oriented with a normal mood and affect, normal behavior and normal judgment and thought content. (R. at 694.)

On April 6, 2017, Dr. Nicolas Tulou, M.D., a state agency physician, completed a physical residual functional capacity assessment of Moore, finding he could perform medium work with no more than occasional climbing of ladders, ropes and scaffolds; no more than frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling; and that did not require concentrated exposure to humidity, fumes, odors, dusts, gases, poor ventilation and hazards like machinery and heights. (R. at 103-05.) Dr. Tulou supported his findings with Moore's diagnoses of back pain from a T9 compression fracture, as well as dyspnea on exertion of unclear cause. (R. at 104-05.)

Also on April 6, 2017, William Carne, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Moore, finding he was not limited in his ability to understand, remember or apply information or to adapt or manage himself; and mildly limited in his ability to interact with others and to concentrate, persist or maintain pace. (R. at 101-02.) He concluded Moore's

anxiety and obsessive-compulsive disorders were nonsevere. (R. at 101.)

Moore continued to receive pain management services from Dr. Terry throughout 2017. Over this time, it continually was noted that his medication regimen provided him tolerable pain most of the time without any adverse events, allowing him to maintain his activities of daily living, household chores and spend time with family and friends without intolerable pain. (R. at 726, 729, 887, 890, 893, 896.) On July 3, 2017, Moore did also state his medication regimen was "falling a little short at times," and he inquired whether he could "have a ½ pill extra per day." (R. at 726.) It appears that Dr. Terry granted this request, as Moore's Percocet prescription was written for 112 tablets as opposed to the usual 100 tablets. (R. at 727.) On November 20, 2017, Moore reported increased neck pain with radiation into the right shoulder and bilateral hand paresthesia. (R. at 890.) Dr. Terry ordered an EMG and nerve conduction study of the right upper extremity, as well as cervical spine x-rays, which were unremarkable. (R. at 887, 891-92.) On December 12, 2017, Dr. Terry ordered an MRI of the cervical spine. (R. at 889.) Moore's physical examination was the same at each of these visits. Specifically, he was in no apparent distress, he had a normal gait, full strength in all major muscle groups, normal muscle tone overall, intact cranial nerves, normal sensation and normal deep tendon reflexes, but pain and decreased range of motion with back flexion and extension. (R. at 727, 730, 888, 891, 894, 897.) At each of these visits, it also was noted that Moore was alert and fully oriented with a normal affect and no aberrant behaviors. (R. at 726-27, 729-30, 887-88, 890-91, 893-94, 896-97.) Over this time, Dr. Terry diagnosed Moore with pathologic vertebral compression fracture; opioid dependence, in remission; neck pain; paresthesia; cervical radiculitis; and moderate, bilateral carpal tunnel syndrome. (R. at 727, 730, 888, 891, 894, 897.) He maintained Moore on the same medication regimen – meloxicam and Percocet – throughout

2017. (R. at 727, 730, 889, 892, 894, 897.)

Moore also continued to treat with Dr. Couch throughout 2017. Over this time, he continued to report back pain and anxiety. (R. at 711, 828, 838.) Nonetheless, it consistently was noted that he was getting out and doing things, and his energy was fair. (R. at 709, 825, 835.) On June 16, 2017, Moore stated, "I feel alright today," and on September 18, and December 18, 2017, he stated, "I feel ok." (R. at 709, 825, 835.) Moore's physical examinations were identical over this time, showing no acute distress, a normal gait and a stable lumbar spine with normal lumbar lordosis, but there was palpable indentation and decreased range of motion. (R. at 711-12, 828, 838.) On mental status examination, he was alert and fully oriented with a euthymic mood and appropriate affect. (R. at 711-12, 828, 838.) At each of these visits, Dr. Couch instructed Moore to continue taking calcium and vitamin D for his old compression fracture and to continue seeing pain management. (R. at 712, 829, 839.) On October 24, 2017, Dr. Couch advised Moore she no longer could prescribe Ambien after a positive urine drug screen for Suboxone, which Moore admitted he obtained from a friend. (R. at 831, 834.)

On July 21, 2017, Stephen P. Saxby, Ph.D., another state agency psychologist, completed a PRTF of Moore, finding he was not limited in his ability to understand, remember or apply information; and mildly limited in his ability to interact with others, to concentrate, persist or maintain pace and to adapt or manage himself. (R. at 118.) Saxby concluded Moore's anxiety and obsessive-compulsive disorders and his depressive disorders were nonsevere. (R. at 117-18.)

On July 24, 2017, Dr. Roger Tims, M.D., a state agency physician, completed a physical residual functional capacity assessment of Moore, finding he could

perform light work with no more than occasional climbing of ladders, ropes and
scaffolds and stooping; no more than frequent climbing of ramps and stairs,
balancing, kneeling, crouching and crawling; and that did not require concentrated
exposure to temperature extremes, wetness, humidity, fumes, odors, dusts, gases and
poor ventilation and hazards like machinery and heights. (R. at 120-22.) Dr. Tims
supported his findings with Moore's various respiratory diagnoses, his chronic pain
related to a thoracic spine compression fracture, GERD and a body mass index,
("BMI"), of 24.82. (R. at 120-22.)

When Moore returned to Wellmont Medical Associates on October 5, 2017,
for treatment for his respiratory impairments, he, again, noted he could do farm work
without much restriction. (R. at 814.) He denied arthralgias and back pain, as well
as decreased concentration, among other things. (R. at 816.) On examination, Moore
was in no distress, and he had normal musculoskeletal range of motion with no
edema or tenderness. (R. at 817.) Mental status examination revealed a normal mood
and affect, as well as normal behavior, judgment and thought content. (R. at 817.)

Moore treated with Dr. Terry on 10 occasions throughout 2018 for pain
management. On January 15, 2018, he reported his neck had not bothered him for a
few weeks, and he felt no further workup or treatment was necessary. (R. at 884.)
On June 4, 2018, Moore reported increased pain at night, and Dr. Terry increased
his monthly supply of Percocet from 112 tablets to 126 tablets. (R. at 869-70.) By
July 2, 2018, he stated he "had a much better month." (R. at 866.) On July 30, 2018,
Dr. Terry inexplicably increased Moore's monthly Percocet supply to 135 tablets.
(R. at 864-65.) Moore's physical examinations consistently revealed no apparent
distress, a normal gait, full strength in all major muscle groups, normal muscle tone
overall, intact cranial nerves, normal sensation and normal deep tendon reflexes, but

pain and decreased range of motion with back flexion and extension. (R. at 864, 867, 870, 873, 876, 879, 882, 885, 914, 917.) At each of these visits, Moore was alert and fully oriented with a normal affect and no aberrant behaviors. (R. at 863-64, 866-67, 869-70, 872-73, 875-76, 878-79, 881-82, 884-85, 913-14, 916-17.) Dr. Terry's diagnoses of Moore included cervical radiculitis; pathologic vertebral compression fracture; and opioid dependence, continuous, and he continued him on meloxicam and Percocet. (R. at 864, 867, 870, 873, 876, 879, 882, 885.)

The record contains three treatment notes from Dr. Couch during 2018. At each of these visits -- in March, July and October -- Moore continued to endorse back pain and anxiety,[10] but he stated, "I feel ok." (R. at 841, 844, 856, 859, 919, 922.) On March 19, 2018, he advised Dr. Couch he wished to come off pain medication, despite his concerns about his chronic pain. (R. at 841.) Dr. Couch stated she would discuss the possibility of Suboxone treatment for chronic pain with another physician. (R. at 846.) Physical examinations at all three visits showed no acute distress, a normal gait and a stable lumbar spine with normal lumbar lordosis, but palpable indentation and decreased range of motion. (R. at 845, 859, 922.) Mental status examinations revealed Moore was alert and fully oriented with a euthymic mood and appropriate affect. (R. at 844-45, 859, 922.) Dr. Couch instructed Moore to take calcium and vitamin D for his old compression fracture and to continue seeing pain management. (R. at 846, 861, 923.)

Moore presented to the St. Charles Community Health Clinic on September 13, 2018, for a "black lung physical." (R. at 901.) He stated he could walk 500 feet on flat ground and negotiate 20 stairs. (R. at 901.) Moore reported an abnormal activity level due to shortness of breath, and he also reported back pain and anxiety.

---

[10] On October 2, 2018, Moore also endorsed depression. (R. at 922.)

(R. at 904-05.) On examination, he was in no acute distress, and his gait was described as normal. (R. at 905-06.) On mental status examination, Moore was alert with appropriate judgment and good insight. (R. at 905-06.) He was advised to perform activity as tolerated. (R. at 907.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Moore's sole argument on appeal is that the ALJ erred by failing to give appropriate credence to his testimony and properly assess the effect of pain on his ability to perform substantial gainful activity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4.)

Moore argues that his testimony that he suffers from severe and chronic daily pain, making it impossible for him to sit, stand, walk or concentrate for prolonged periods, is supported by the objective medical evidence and his continued treatment for chronic pain. However, Moore argues that the ALJ failed to properly consider his testimony. Contrary to Moore's argument, the Commissioner contends that substantial evidence supports the ALJ's finding that Moore's allegations of disabling chronic back pain are not entirely consistent with the medical and other evidence of record. As the Commissioner stated in his brief, Moore did not cite to specific testimony to which the ALJ did not give appropriate credence. However, as the Commissioner further noted, it would appear he is referring to his testimony that he has back pain "all the time" and that his medication provides only "short relief." At his hearing, Moore testified he could sit for only 30 to 40 minutes, stand for "pretty

much the same" amount of time, walk for only a couple hundred feet due to back pain and that his back pain hindered his ability to focus and concentrate. (R. at 52-54.)

The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. § 404.1529 and Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[11] *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[12] presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95 (citing 20 C.F.R. § 404.1529(b) (2020); S.S.R. 16-3p, 2017 WL 5180304, at *3); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether he is disabled. *See Arakas*, 983 F.3d at 95 (citing 20 C.F.R. § 404.1529(c) (2020); S.S.R. 16-3p, 2017 WL 5180304, at *5); *see also Craig*, 76 F.3d at 595. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements regarding the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. § 404.1529(c)(2); *Craig*, 76

---

[11] "Symptoms" are defined in the regulations as a claimant's own description of his medical impairment. *See* 20 C.F.R. § 404.1502(i) (2020).

[12] The regulations define "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2) (2020).

F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 592-93. However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [his medical] history, the medical signs and laboratory findings, and statements by [his] medical sources or other persons about how [his] symptoms affect [him]." 20 C.F.R. § 404.1529(c)(4) (2020). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

Here, the ALJ stated as follows in his decision:

… [T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSR 16-3p.

> … In considering the claimant's symptoms, the undersigned must
> follow a two-step process in which it must first be determined whether
> there is an underlying medically determinable … impairment … that
> could reasonably be expected to produce the claimant's pain or other
> symptoms.
>
> … Second, once an underlying … impairment that could reasonably be
> expected to produce the claimant's pain or other symptoms has been
> shown, the undersigned must evaluate the intensity, persistence, and
> limiting effects of the claimant's symptoms to determine the extent to
> which they limit the claimant's functional limitations. For this purpose,
> whenever statements about the intensity, persistence, or functionally
> limiting effects of pain or other symptoms are not substantiated by
> objective medical evidence, the undersigned must consider other
> evidence in the record to determine if the claimant's symptoms limit
> the ability to do work-related activities.

(R. at 20-21.) In his decision, the ALJ further acknowledged that "[p]ain and
symptoms are not always accompanied by objective evidence," and he would not
disregard Moore's statements regarding his symptoms solely due to a lack of
objective evidence. (R. at 24.) However, he further correctly noted that objective
evidence can be used to "bolster a claimant's subjective complaints of pain and
symptoms and is a 'useful indicator to help make reasonable conclusions about the
intensity and persistence of symptoms.'" (R. at 24) (quoting S.S.R. 16-3p, 2017 WL
5180304, at *5).

Thus, the ALJ explicitly set out the appropriate, two-step legal framework for
considering Moore's allegations of pain in his decision. After stating the framework,
the ALJ proceeded to set out a thorough recitation of Moore's statements regarding
his pain. This included information Moore provided in a Function Report, dated
February 3, 2017, as well as his testimony at the hearing. Specifically, the ALJ noted
the following information stated by Moore in the Function Report: he lives at home
with his family; he wakes up around 5:30 each morning; he drives his daughter to

school; he spends the remainder of his day watching television, but he must change positions often due to pain; he has no difficulty performing personal care, such as dressing, feeding himself and using the toilet, but he has some difficulty with bathing due to shortness of breath; his wife prepares all meals, and he does not perform household chores or yard work; he goes out daily and can drive himself and go out alone; he has difficulty with lifting, standing, walking and stair climbing; and he can walk about 200 feet, unless there is an incline, before having to stop and rest for 10 to 15 minutes. (R. at 21, 264-71.) Next, the ALJ noted that, at the hearing, Moore testified he was on doctor-prescribed pain medication for his back, but other than that, he was advised to watch what he was doing, including when he picked up objects; he could sit and stand for 30 to 40 minutes each and could walk a couple hundred feet; he could not sit all day due to pain; and he had difficulty focusing and concentrating due to worry about his alleged impairments. (R. at 21-22.)

The ALJ next turned to an analysis of Moore's symptoms, stating, in part, "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. …" (R. at 23.) Thus, the ALJ satisfied the first part of the two-part test for analyzing Moore's allegations about his symptoms. *See Arakas*, 983 F.3d at 95; *Craig*, 76 F.3d at 594. The real issue, therefore, is whether he correctly analyzed Moore's pain under the second part of this test. For the reasons that follow, I find that he did.

In his decision, the ALJ stated, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. at 23.) The ALJ offered the following reasons to

support this finding: (1) Moore's treating medical providers placed no limitations on him or opined he was unable to work; (2) his treatment had been essentially routine and/or conservative; (3) his treatment regimen resulted in a tolerable pain level and allowed him to maintain his activities of daily living, household chores and spend time with family and friends without intolerable pain; (4) the lack of regular complaints by Moore and failure to seek treatment for his alleged impairments; (5) the lack of reports to treating providers by Moore of major functional limitations, such as those he alleged at the hearing; (6) physical examinations of Moore's back showed normal range of motion and no tenderness; and (7) mental status examinations typically showed no abnormalities. (R. at 23-24.) The court will look at each of these grounds in turn, but, first, the court notes that each of these considerations was proper under the regulations. In particular, the regulations provide that "all of the available evidence from … medical … and nonmedical sources about how [a claimant's] symptoms affect [him]" will be considered by the ALJ at step two of the symptom evaluation framework. 20 C.F.R. § 404.1529(c)(1) (2020). The regulations further state that objective evidence is a "useful indicator to assist … in making reasonable conclusions about the intensity and persistence of … symptoms and the effect those symptoms, such as pain, may have on [the] ability to work." 20 C.F.R. § 404.1529(c)(2). However, the regulations recognize that, "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other evidence you may submit about your symptoms." 20 C.F.R. § 404.1529(c)(3) (2020). For instance, ALJs may consider the following evidence: (1) daily activities; (2) location, duration, frequency and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness and any side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) measures

used to relieve pain or other symptoms; and (7) other factors concerning a claimant's functional limitations due to pain or other symptoms. *See* 20 C.F.R. § 404.1529(c)(3)(i)-(vii) (2020).

Here, as the ALJ stated, Moore's treating providers placed no limitations on him, and none opined he could not work. In fact, the treatment notes from Dr. Couch, his primary care provider, consistently show that Moore was "getting out and doing things," and the notes from Wellmont Medical Associates repeatedly indicate Moore could "do farm work without much restriction." At a "black lung physical" in September 2018, no restrictions were placed on Moore's activities aside from being instructed to perform activity as tolerated. Next, as the ALJ stated, Moore's treatment was conservative in nature, consisting of pain medication, non-steroidal anti-inflammatories, vitamins and supplements and over-the-counter pain relievers. At the time of the hearing, Moore testified he was receiving no active treatment for his back pain, and there is no evidence he underwent physical therapy or injection therapy during the relevant time or that such treatments were recommended. Moore simply testified his back would be ok if he watched what he was doing when he bent over and the way he got back up. He further testified he did not lift items that weighed anything. Moreover, the record is replete with reports that Moore's medication regimen resulted in tolerable pain levels which allowed him to perform daily activities, household chores and socialize with friends and family. Next, the ALJ incorrectly stated that physical examinations of Moore's back showed normal range of motion and no tenderness. The court notes that, in fact, many of the examinations revealed pain and decreased range of motion with back flexion and extension, as well as a palpable indentation. Nonetheless, these examinations further showed Moore was in no apparent distress, he had a normal gait, a stable lumbar spine with normal lumbar lordosis, full strength in all major muscle groups, normal

muscle tone overall and normal sensation and deep tendon reflexes. In April and October 2017, he did exhibit normal range of musculoskeletal motion with no edema or tenderness. Thus, Moore's physical examination findings can be described as consistently mild or benign. Lastly, none of Moore's treatment providers documented any difficulties with his ability to focus or concentrate, and Moore did not voice any such complaints to his medical providers. In fact, his mental status examinations during the relevant period showed no abnormalities.

For all the above-stated reasons, I find that the ALJ did not improperly disregard Moore's statements about his pain. To the contrary, the ALJ thoroughly considered such statements and credited them to the extent they were consistent with the record as a whole. As stated herein, in making the determination at the second prong of the symptom evaluation framework, the ALJ must examine the entire case record, including the objective medical evidence, the claimant's statements about the intensity, persistence and limiting effects of his symptoms, statements and other information provided by medical sources and other persons and any other relevant evidence in the claimant's record. *See* S.S.R. 16-3p, 2017 WL 5180304, at *4. Here, the ALJ reviewed Moore's relevant medical history and his subjective allegations in detail before finding his statements regarding the severity of his limitations were not entirely credible because they were not fully supported by the objective medical evidence and his treatment history. The ALJ was entitled to find that the objective medical evidence outweighed Moore's subjective statements, and he provided a sufficient rationale for doing so. It is well-supported that a reviewing court gives great weight to an ALJ's assessment of a claimant's credibility and should not interfere with that assessment where the evidence of record supports the ALJ's conclusions. *See Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984). Here, the ALJ's decision was thorough and applied the proper legal standard, and this court

will not reweigh the evidence.

For all the foregoing reasons, I find that the ALJ's evaluation of Moore's pain was based on a correct legal standard and is supported by substantial evidence. Based on the same evidence stated above, I further find that substantial evidence supports the ALJ's residual functional capacity finding and ultimate finding that Moore was not disabled under the Act and not entitled to benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's analysis of Moore's subjective complaints of pain;
2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and
3. Substantial evidence exists in the record to support the Commissioner's finding that Moore was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Moore's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. §

636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    April 9, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE